IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs October 17, 2001

## MARIO HAWKINS v. STATE OF TENNESSEE

**Post-Conviction Appeal from the Criminal Court for Davidson County**
**No. 95-D-2368     Steve Dozier, Judge**

———————————

**No. M2000-02901-CCA-R3-CD - Filed July 31, 2002**

———————————

After a juvenile court transferred the petitioner's case, a Davidson County grand jury indicted the petitioner on one count of first degree murder. Following a jury trial, the petitioner stood convicted of this offense and for this conviction received a life sentence. Thereafter he unsuccessfully sought relief through a direct appeal. See State v. Mario Hawkins, No. 01C01-9701-CR-00014, 1998 Tenn. Crim. App. LEXIS 685, at *2, *21 (Tenn. Crim. App. at Nashville, July 2, 1998). Subsequently, he filed a pro se petition for post-conviction relief and was appointed counsel. Counsel filed an amended petition alleging ineffective assistance of trial counsel. After conducting a hearing on this matter, the trial court denied the petitioner the relief requested. Through this appeal the petitioner continues to assert that trial counsel provided ineffective assistance by failing to adequately investigate the petitioner's mental health and utilize this information as a defense to the first degree murder charge. However, after reviewing this assertion, we find it to lack merit. We, therefore, affirm the trial court's denial of the post-conviction petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Dwight E. Scott, Nashville, Tennessee, for appellant, Mario Hawkins.

Paul G. Summers, Attorney General & Reporter; T.E. Williams, III, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Kimberly Haas, Assistant District Attorney General, for appellee, State of Tennessee.

**OPINION**

**Factual Background**

In order to address the issue raised, a factual background is needed from both the petitioner's trial and from his post-conviction petition hearing. With respect to the proof at trial, this Court summarized the evidence as follows in handling the petitioner's direct appeal:

At approximately 6:30 p.m. on January 11, 1995, Metro Police found fifteen year old Cedric Mosley laying face down in a pool of blood on a sidewalk near the Cumberland View housing project in North Nashville. The victim was transported to a hospital where he died early the next morning as a "result of shotgun wounds to the head and right hip, the primary contributor being shotgun pellet wound injuries to the brain." Earlier that afternoon, around 5:00 p.m., the victim and Lamont McDonald had been involved in a heated argument over "a girl." The argument subsided and McDonald left upset over the encounter. Shortly before 6:30 p.m., McDonald and three associates, later identified as the appellant, Lamont Johnson, and Kevin Walker, returned to the Cumberland View housing project to look for Mosley. As a result of the conduct which followed, all four men were subsequently indicted for the first degree murder of Cedric Mosley.

At trial, the State presented the testimony of co-defendants Kevin Walker and Lamont Johnson. Also testifying as material witnesses for the State were Rodney Walker, Otis Stewart, and Mario Gray. Both Rodney Walker and Kevin Walker observed the initial encounter between Mosley and McDonald. Fifteen year old Rodney Walker testified that neither Mosley nor McDonald was armed with a weapon. He stated that the altercation was merely verbal, involving some swearing, but, no physical interaction. Nineteen year old Kevin Walker, a co-defendant, testified that he also witnessed the argument. During the altercation, Kevin Walker remained in McDonald's 1995 green Ford Taurus. Although he did not see either party armed with a weapon during the initial encounter, he stated that, shortly after this confrontation, he observed Cedric Mosley with a gun. After the argument subsided, Lamont McDonald and Kevin Walker left the area in McDonald's car.

Kevin Walker testified that, when McDonald returned to the car, he was very angry. McDonald paged Lamont Johnson. Johnson testified that, during his telephone conversation with McDonald, McDonald sounded "upset" and "furious." McDonald then proceeded to a house on Douglas Street in East Nashville, later determined to be the home of the appellant, where the two young men joined Lamont Johnson. Shortly thereafter, the appellant returned to his home on Douglas Street. Johnson, McDonald, and the appellant engaged in a brief discussion, after which, the four men left the appellant's house armed with two twelve-gauge shotguns and one .32 caliber handgun. McDonald was armed with the handgun, while the appellant and Johnson each were in possession of a sawed-off shotgun.

The group proceeded to a birthday party for Johnson's younger sister, where they ate birthday cake and ice cream. The weapons remained in McDonald's vehicle. The group then left the party and headed toward Cumberland View housing project.

Walker testified that, although he never heard any conversation about what the others intended to do, he was under the impression that they planned to scare somebody, namely Cedric Mosley. McDonald informed the others that he believed that Mosley would be in the area of 25th Avenue North, because that is where he liked to "hang out." McDonald parked his car on 26th Avenue North. McDonald, Johnson, and the appellant exited the vehicle, each armed with a weapon. Walker remained in the vehicle with the doors locked. Outside the car, Johnson positioned himself behind a tree, while McDonald and the appellant began looking for the victim.

McDonald and the appellant encountered Cedric Mosley, who was talking with Otis Stewart and Mario Gray. McDonald had his weapon pointed at Mosley. Mosley and his companions were not armed. McDonald and Mosley argued briefly. Stewart testified that Mosley begged him to tell McDonald, his cousin, to "quit and leave him alone." Stewart begged McDonald to put the gun down, but he refused. McDonald then fired his weapon into the air. Mosley again told McDonald to leave him alone. Mosley and Stewart began running. Lamont Johnson, who remained hiding behind a tree, testified that the appellant then fired his shotgun, hitting Mosley in the upper body. The appellant fired again, hitting Mosley, who had then fallen to the ground, a second time. The appellant placed a "slug" in his shotgun and stated that "he wanted to put this in the m----f----." All three shots fired by the appellant struck the helpless Mosley. While Mosley lay wounded on the pavement, the appellant, Johnson, and McDonald ran back to McDonald's vehicle.

Once in the car, McDonald stated to the others, "He's not dead, he's not dead. . . . Man, I've got to make sure he's dead, you know." The group then drove back to the appellant's residence. Upon arriving at the appellant's East Nashville residence, the appellant unloaded the weapons from the vehicle and informed his mother that "he had smoked him a m----f----."

At the appellant's trial, Otis Stewart, Rodney Walker, and Mario Gray, the three non-accomplice eyewitnesses, testified that the individual that had shot Mosley three times with a shotgun was wearing a black and purple Fila coat with the hood pulled over his head. The proof revealed that the appellant was wearing a Fila coat on the night of the murder and that neither Johnson nor McDonald were wearing such a coat. Moreover, Mario Gray, while on the stand, identified the appellant as the shooter.

Based upon this evidence, the jury returned a guilty verdict of premeditated first degree murder.

Id. at *2-*7.

At his post-conviction hearing the petitioner presented testimony from his former counsel, his mother, and himself. Former counsel stated that he had been aware that the petitioner had a prior history in juvenile court. The attorney explained that he had pursued an identity defense because he had reason to believe that the only individuals who would identify the petitioner were the petitioner's co-defendants. Former counsel added that one of these individuals "was a very bad witness" for the State and that counsel had essentially destroyed this witness' credibility on cross-examination. Furthermore, though counsel acknowledged that another of the co-defendants had made a good, straight-forward State witness, counsel still did not think that the State would be able to sufficiently corroborate the co-defendants' accounts of the crime. However, counsel recalled that the State's last witness,[1] who had been present at the shooting but had never before been able to identify the petitioner as the shooter, was at trial able to identify the petitioner as the shooter. According to trial counsel the witness also admitted that the lighting had been bad that night, that the assailant's face had been covered, and that he (this witness) had not previously told anyone that he could identify the petitioner as the shooter. Nevertheless, the witness claimed that he could identify the petitioner by height. Counsel indicated that such a statement was "ridiculous" unless the heights involved were extreme.

Concerning the petitioner's social and medical history, trial counsel acknowledged that he could not recall whether he had reviewed the petitioner's juvenile and school records prior to trial but stated that he had been aware that the petitioner was not intelligent. Because of this, counsel indicated that he had occasionally needed to explain some topics to the petitioner over and over again. However, counsel found the petitioner to be "fairly street smart" with some concept "of what [was] going on." While counsel could not recall asking the petitioner's mother about the petitioner's mental condition, counsel indicated that she had not brought this issue to his attention. Trial counsel also read from an administrative report reflecting that the petitioner had a "severe" personality disorder, and the witness acknowledged that he had been unaware of this. Nevertheless, counsel maintained that he did not "think the jury would have bought" a defense based on this. He further opined that this type of defense might have opened the door to evidence harmful to the petitioner such as the petitioner's juvenile history involving robbery and assaults. Additionally, counsel was concerned that the State might have called the petitioner's mother to testify and elicited proof favorable to the prosecution from her. Former counsel also saw danger in making the jury aware that the petitioner was impulsive and had previously experienced homicidal ideation. Though counsel ultimately acknowledged that such history could have been used to negate the deliberation element applicable in first degree murder cases at that time, he maintained that he did not think that this knowledge would have caused him to deviate from the identity defense presented. Under questioning by the trial court, former counsel concluded by stating, "I don't fault that [the petitioner] had some mental issues. I just don't think that they rose to the point of being exculpatory in nature."

---

[1] This individual was not a co-defendant.

The petitioner next called his mother. This witness testified that the petitioner had problems before the family had moved to Nashville; that he accidentally hurt other children when playing with them; and that she had been unaware that the petitioner received supplemental security income benefits because he suffered from a severe personality disorder. She had believed that the benefits were given to him because he was "slow." She added that trial counsel had never asked her about the petitioner's psychological problems but that the attorney had been aware that the petitioner received disability benefits since these checks paid for the attorney's services. Her testimony also provided varying details about the petitioner's behavior. For example, she related that the petitioner was easily angered; would walk away and talk to himself when angry; could not control his impulses; has hit his brother; but has not acted violently on impulse as far as she knew.

Finally, the petitioner testified on his own behalf. He admitted that he had juvenile robbery and assault charges. Regarding his school history, he acknowledged that he had fought at every institution he had attended, including the last, which was said to be "a school for children who have behavioral problems." He added that he had brought a gun to school and had received numerous suspensions. Thereafter the petitioner stated that he had trouble controlling his anger. Concerning the victim in this case, the petitioner testified that he had not known him and had no reason to have shot him. At the post-conviction hearing the petitioner claimed to have been frustrated and stressed around the time of the offense because of the then recent death of his grandmother, the shooting deaths of two of his friends, and a drive-by shooting into various family cars and his home. The petitioner also testified that at the time of the offense he had been under the influence of beer, liquor, marijuana, and cocaine. With respect to his mental health history, the petitioner averred that he had been aware of his learning disability but that he had not known about any of the above-referenced psychological problems. He also indicated that trial counsel had not asked if he had been psychologically evaluated. Regarding other conversations with counsel, the petitioner admitted that he had originally denied being the shooter but had confessed to counsel approximately one week thereafter.[2] Furthermore, the petitioner stated that he had understood some aspects of the discussion of his defense with trial counsel, but the petitioner could not recall which parts he had not understood.

At the conclusion of this proof, the trial court took the matter under advisement. Through a subsequently filed order, the trial court denied the petition.

## Post-Conviction Standard of Review

In analyzing this appeal, we first note that a petitioner bringing a post-conviction petition bears the burden of proving the allegations asserted in the petition by clear and convincing evidence.

---

[2] Trial counsel indicated that he did not learn that the petitioner had been present at the scene of the crime until after the trial.

See Tenn. Code Ann. § 40-30-210(f). Moreover, the trial court's findings of fact "are conclusive on appeal unless the evidence preponderates against the judgment." Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993).

## Ineffective Assistance of Counsel

As above-noted, the petitioner claims that former counsel provided ineffective assistance by failing to investigate the petitioner's mental history and by failing to use this history in an attempt to negate the premeditation and deliberation elements required to prove first degree murder at the time of the petitioner's trial. When a petitioner seeks post-conviction relief on the basis of ineffective assistance, the petitioner must prove "that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial." Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). To satisfy the deficient performance prong of this test, the petitioner must establish that the service rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Furthermore, to demonstrate the prejudice required, the petitioner "must show that there is a reasonable probability that, but for counsel's" deficient performance, "the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). In fact, "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Id.

Turning to the instant case, the petitioner correctly points out that, effective July 1, 1995, the state legislature amended Tennessee Code Annotated section 39-13-202(a)(1), in part, by omitting the word "deliberate" therefrom. See Tenn. Code Ann. § 39-13-202 (Supp. 1995) (notation outlining amendment). On the same effective date Tennessee Code Annotated section 39-13-201(b) was deleted from our code. See Tenn. Code Ann. § 39-13-201 (1997) (Sentencing Commission Comments). A portion of this sub-section had provided the definition of a deliberate act as being "one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b) (Supp. 1994). Since this offense was committed in January of 1995, the prior statute applied to this crime; therefore, the pertinent portion of this statute defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1994) (emphasis added). In addition, we observe that precedent provides that "premeditation requires proof of a previous intent to kill, while deliberation requires proof of a 'cool purpose' that includes some period of reflection during which the mind is free from passion and excitement." State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997); see also, e.g., State v. Brown, 836 S.W.2d 530, 539-40 (Tenn. 1992).

-6-

Beyond this background, the petitioner points to an attorney's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. However, this Court is also mindful that we are not "to 'second guess' tactical and strategical choices pertaining to defense matters or measure a defense attorney's representation by '20-20 hindsight'" in deciding ineffective assistance of counsel matters. Cooper, 849 S.W.2d at 746.

Declining to employ such hindsight, we find that the petitioner has failed to prove his contentions by clear and convincing evidence. More specifically, we determine that the petitioner has not shown that counsel rendered deficient performance by electing not to assert a defense based on the petitioner's mental history or that prejudice resulted from trial counsel's alleged failures. In view of the latter, we need not even reach the issue of whether counsel should have more thoroughly investigated the petitioner's mental history.

At the outset of our analysis, we observe that former counsel brought much experience to bear upon the handling of this case. He had practiced law since 1968 with criminal cases comprising around sixty percent of his caseload. In addition, he agreed that his legal career had included "extensive contact with juvenile delinquents," and by the time of the hearing, he had become a juvenile court referee. Beyond this, counsel stated that he had been involved with other murder cases in both juvenile and criminal courts and had handled jury trials. As above-noted, counsel believed that attacking the State's identification of the petitioner was the best defense for the petitioner.

In finding as we do, we remain mindful of the weaknesses involved in the defense pursued at trial. For example, co-defendants of the petitioner identified him as the assailant. Others indicated that the shooter had worn a Fila coat, and witnesses testified that the petitioner wore a Fila coat. However, trial counsel agreed "that the State's witnesses were not exactly choir boys," and, as such, many were subject to cross-examination attacking their credibility. Regarding the co-defendants'/accomplices' testimony, counsel had believed that the State would lack sufficient corroboration thereof. We observe that the corroborative evidence specifically referenced by this Court in affirming the conviction on direct appeal was the aforementioned in-court identification by a non-accomplice. See Mario Hawkins, 1998 Tenn. Crim. App. LEXIS 685, at *11-*12. Yet this appears to have been unanticipated by both the State and the defense. As such, this situation classically represents the type in which we are not to utilize "20-20 hindsight." Furthermore, the State arguably experienced some difficulty supplying the jury with a motive[3] explaining why the petitioner would have shot and killed the victim since nothing indicated that the petitioner had any

---

[3] While motive is not an element needed to be proven in order to support a conviction for murder, jurors often require such explanatory proof before they will convict an accused of this offense. We also note that the assailant's identity must be proven in a murder case, and this Court has observed that motive may be helpful in proving identity. See State v. Frankie E. Casteel, No. E1999-00076-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 248, at *31 (Tenn. Crim. App. at Knoxville, Apr. 5, 2001).

previous contact with him. Apparently, the State's argument was either that the petitioner had fired the shots at a co-defendant who was also present at the crime scene and who had previously fought with the victim or that the petitioner had simply wanted to shoot someone. With this combination of problems, trial counsel believed it best not to assist the State by admitting that the petitioner had been present and had fired the shots. Assertion of a mental defense such as that suggested by the petitioner would have necessitated such an admission.

When specifically asked about the potential use of a defense based on the petitioner's mental health history, trial counsel acknowledged that it would have been possible to assert this defense based upon the information counsel had learned at the post-conviction hearing. Nevertheless, he remained adamant in his opinion that such a defense had little likelihood of success. Beyond the dangers of admitting the petitioner's participation in the crime, counsel had found juries highly skeptical of mental defenses. Furthermore, he pointed to other potential pitfalls accompanying such a defense here. For example, had counsel attempted to negate the above-defined element of deliberation by asserting that the petitioner had experienced problems with curtailing violent impulses, counsel feared opening a "Pandora's box" containing the petitioner's juvenile history of aggravated assault, aggravated robbery, violence at school, etc. In addition, petitioner's previous alleged homicidal ideations may have proven harmful. There was even a possibility that the petitioner's mother might have provided damaging testimony if she had been called as a result of asserting this type of defense. Finally, many of the facts in this case could be interpreted as reflecting premeditation and deliberation. More specifically, the petitioner and his co-defendants came together at the petitioner's house, left it armed, spent time at a child's birthday party, and thereafter sought out the victim. Shortly after finding him, the petitioner shot the victim multiple times though the petitioner had no direct prior conflict with the victim.

In sum, a defendant is not entitled to "perfect representation." Vermilye v. State, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987). Our review leads us to conclude that rational support exist for the defense theory pursued by trial counsel and that the mental defense urged by the petitioner is plagued with problems of its own. Under the facts and circumstances of this case, presenting a successful defense would likely have been difficult. At the least, we remain unpersuaded that the result of the trial would have been different but for counsel's alleged deficient performance. See, e.g., Cooper v. State, 847 S.W.2d 521, 523-28 (Tenn. Crim. App. 1992). Since the petitioner has failed to prove either deficient performance of counsel or actual prejudice from the alleged deficiencies we find the trial judge acted properly in denying the post-conviction petition.

## Conclusion

For the foregoing reasons we find that the petitioner's allegation does not merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE